RICHARD W. WHITE, plaintiff in error, *vs.* WILLIAM I. CLEMENTS, defendant in error.

1. The statements of a register of voters that he had marked a registered person's name with a " C " to demonstrate that he was a colored person, and had posted his list, for some time, in a public place, and that no application had been made to have said letter erased, is not evidence that the person is a colored person, it not being shown that the person knew of the entry or that it was the subject of conversation.

2. Although the copy of a paper, proven to be beyond the jurisdiction of the Court, is good secondary evidence of its contents, yet it must be shown that the original was duly executed.

3. An application for life insurance, though signed by the applicant, upon the *back* of which was an entry by the examining physician, that the applicant was a mulatto, is no evidence of the fact, unless it be proved that the person signed the paper after the entry on its back was made by the physician and with the knowledge of the entry, and with intent to adopt it, or that he used the paper after the entry was made, with a knowledge that such entry was there.

5. Pedigree, relationship and race may be shown by evidence of reputation among those who know the person, where pedigree or race is in question.

5. The statement by an examining physician, that he had at a certain time examined a person, and had *then* been of opinion that the person was a mulatto, is not evidence. Whether or not a person is colored, that is, has African blood in his veins, is matter of opinion, and a witness may give his opinion if he states the facts on which it is based. Whether the fact that one has one-eighth of such blood be matter of opinion. (Quere.) One who testifies that he has studied ethnology may give his opinion, as an expert, on a question of race.

6. When there was a *quo warranto*, and a demurrer, and also an answer denying a material fact, and a jury summoned to try the issue, and the defendant called up the demurrer and no objection was made to the hearing of it at that time, and the demurrer was heard as a distinct motion, and a distinct judgment was had thereon before the issue was presented to the jury: *Held*, that, in the argument on the demurrer, the defendant had the right to open and conclude.

7. A *quo warranto* was issued charging that a person holding an office was ineligible when chosen, because of his having in his veins one-eighth or more of African blood, and there was a demurrer to the information as well as an answer denying the fact, upon which denial there was an issue and a trial before a jury: *Held*, That by the Code of Georgia a person having one-eighth or more of African blood in his veins is not ineligible to hold office in this State, and it was error in the Court to overrule the demurrer and to charge the jury that if the plain-

tiff proved the defendant to have one-eighth or more of African blood, he was ineligible to office in this State. WARNER, J., dissents as to this head note.

· *Quo Warranto.*  Tried before Judge WILLIAM SCHLEY. Chatham County.  March, 1869.

Clements filed his petition, under oath, stating, that at an election held in said county, in April, 1868, for Clerk of its Superior Court, no one was voted for but himself and White; that this was an election at which a plurality elected; that by the Code of Georgia it is enacted, that if, at any popular election to fill any office the person elected is ineligible, the person having the next highest number of votes, who is eligible, whenever a plurality elects, shall be declared elected, and be duly qualified and commissioned to such office; that White got a plurality of the votes, had been commissioned, and was exercising the privileges, etc., of the office; that he was eligible, and that White was not, because he was a person of color.  He prayed leave to file an information in the name of the State, in the nature of a *quo warranto*, calling on White to show by what right he held said office, why he should not be amoved therefrom, and Clements should not be qualified and commissioned as such Clerk.

The Judge ordered White to shew cause on the 26th of January, 1869.  Leave having been granted, the Solicitor General filed the information upon the grounds and for the purposes aforesaid.  White having been served, appeared by his counsel on the 4th of March, and filed a general demurrer to said petition.  (As it was simply intended to raise the question whether a negro could hold the office the form of the information is immaterial.)  He then moved for a continuance upon the ground of the absence of his associate counsel.  Leading counsel being present, the Court refused the continuance.  Said demurrer was then immediately withdrawn, no argument upon it having been had.  White's attorney then plead that he received a majority of the votes polled at said election; that he had been, was then and yet, a citizen of the United States, and of said State and county;

that he was eligible, and qualified by law for said office; that he had been commissioned, and was in possession of the books and papers pertaining to the office; that he was not a person of color, and had not in his veins one-eighth or more of African or negro blood. A continuance was again asked for and granted, and a jury was summoned to try the issue on the 22d of March. On that day White's attorneys again moved for a continuance for the following reasons sworn to by him: That on the 6th day of March, 1869, he, by his counsel, A. W. Stone, prepared a set of interrogatories to be propounded to Charles Green, a material witness for the respondent, and who resides in San Francisco, California; that on the same day he was informed by his said counsel that the said interrogatories had been handed to or left at the office of Hartridge & Chisholm, counsel for relator; that on the Monday following the interrogatories were returned crossed to his said counsel, and by him deposited, properly stamped in the post office in Savannah, directed to Edward Everett, one of the commissioners named in the commission, to be executed and returned; that the said interrogatories have not been returned; that the witness resides in San Francisco, California, and over five hundred miles from Savannah; that the testimony of the said witness is material to his defence; that by said witness he expects to prove his race and nationality, and that there is no negro or African blood in his veins. Deponent expects the said interrogatories will be executed and returned to said Court within the time limited by the rules of Court for the return of commissions of a witness more than five hundred miles from the place of trial, and that he will be able to procure such testimony by the next term of said Court; that the said cause was assigned on the 4th of March, for trial on the 22d; that the interrogatories were made out and handed to counsel for relator on the 6th, and mailed on the 8th of March. Deponent submits to the Court if he has not shown due diligence in sueing out and having had said interrogatories executed."

The continuance was refused. The attorneys for White then filed a general demurrer to the information, and claimed

White *vs.* Clements.

the right to begin and conclude the argument upon it.   The Court held that that right belonged to the attorneys of Clements.   Argument upon the demurrer, as a distinct motion was so had, and the Court overruled the demurrer holding that, under the Constitution and laws of Georgia, a person of color was ineligible to office.   The case then went to the jury. The evidence was as follows, (all offered by the plaintiff.)

RICHARD MIMMS, p. c., sworn, and says : " I met Richard W. White, some time since, in Captain Doyle's store, either last summer or the summer before last; he told me that he, White, came from Barnwell District before the war; he made his escape from a master or guardian.   I do not recollect the language White used.   I do not know the distance from Barnwell District.   I was never there.   I am from Edgefield, South Carolina, myself.   White and I had a difficulty some time ago ; we have not spoke, but I have nothing against him at this time.   He, White, came from South Carolina originally."

A. N. WILSON sworn and says: " I know this respondent.   The first time I ever saw him was in October or November, 1867, in a meeting which was held for the purpose of nominating candidates for the State Constitutional Convention.   White made a speech (the first, I think) in favor of nominating an equal number of whites and blacks ; that is in behalf of the colored part of the convention, when I inquired and found out his name."

ALBERT JACKSON sworn and says: " I was one of the Registers in the year 1867.   There was a check put after White's name to designate him as a colored man.   A list designating persons which had been arranged by the Board was posted up at the Court House.   I do not know whether or not it was there all the time during the election.   From these facts, and seeing him several times in the company of colored persons, I took him to be one.   I have seen Spaniards and Italians as dark as White.   I believe White is reputed a person of color.   The list of the registered voters was put up in the Court House for two or three weeks before the election.   Against the name of the defendant the letter C.

was marked, indicating colored. The Registers left the list open for correction for three weeks before the election, and White did not ask any correction."

DR. EASTON YONGE sworn, said : " I have been a practicing physician for twenty years ; examined the respondent, and gave a certificate to the Knickerbocker Insurance Company that he was a mulatto. I have studied the science of Ethnology, but not a great deal ; this study leads one to inquire the difference of races. I came to the conclusion, however, that respondent was a mulatto from external indications. I think any intelligent person could tell as well as I could, (if much among the negroes,) the difference between a white man and person of color, from observation."

J. S. HOWARD sworn said : "This book in Court contains copies of all applications for Life Insurance to the Knickerbocker Life Insurance Company. The originals are all sent on to New York. This application, which is signed with the name of respondent, I think, was signed by himself for his wife. I do not know his hand writing ; don't know whether he or his wife signed the name."

To so much of the testimony of Albert Jackson as related to his acts as Register, and to so much as related to the reputation of defendant being a man of color, the defendant objected. The Court overruled the objections and allowed the testimony to be submitted to the jury.

To so much of the testimony of Dr. Young, as is founded on his medical knowledge, and his opinion as such, the defendant objected. The Court overruled the objection and allowed the same to be submitted to the jury.

The plaintiff offered to read said copy in said insurance book in evidence, and the defendant objected. The Court overruled the objection and allowed said copy in said book to be read in evidence.

After argument had, the defendant requested the Court to charge the jury, that the defendant being in the exercise of the function of the office, the presumption of the law is that he is entitled to it, and it is incumbent on the plaintiff to rebut such presumption by legal proof, and if plaintiff should

fail to make out every point in his case they must find for the defendant; which charge the Court refused to give, but charged the jury :

First—The law says any person having one-eighth or more of negro or African blood in his veins is ineligible to office; I have, therefore, decided on the demurrer that a negro or person of color cannot hold office in Georgia.

Second—The legal question then having been disposed of by the Court, the issue of fact is now submitted for your consideration, whether or not the defendant has one-eighth of negro or African blood in his veins.

Third—You must now look to the testimony and see if the plaintiff has legally proven to your satisfaction, that the defendant has one-eighth of negro or African blood in his veins. If he has not, then, you must find for the defendant, but if it is proven to your satisfaction that the defendant has the one-eighth or more of negro or African blood in his veins, then you cannot but find for the plaintiff.

Fourth—In this case the respondent dwells upon the insufficiency of the relator's proof, and asks at your hands a verdict in his favor.

Fifth—I am requested to charge you on the character of the testimony—that where blood, race, etc., is the subject— you can take general hearsay, or the reputation of the person in his community, that is what he says of himself, what others say of him, his associates, and his general reputation as such in the community in which he resides, etc., in order to determine as to his being a white man or a person of color. Under slavery no records were kept of births or marriages among slaves, and hence the rule as to general reputation and hearsay was more applicable to blacks than whites. Now you must look to the testimony and be satisfied in your own minds that the facts disclose one-eighth or more of negro or African blood in the veins of the respondent before you can find for the relator. I am further requested by the defendant to charge you "that the defendant being in the exercise of the functions of the office, the presumption of the law is that he is entitled to the office, and it is encumbent on

the plaintiff to rebut such presumption by legal proof, and if the plaintiff should fail to make out every point in his case, you must find for the defendant." I cannot charge you in the language asked for, but I do charge you as a general principle of law, that any person holding an office, the law presumes him eligible and competent to hold the same, but that presumption refers to his acts as such officer where the rights of others were affected, such as attestation, and other acts in the line of his office. But where, as in this case, the issue has no reference to any official act, but as to the race or blood of the defendant disqualifying him from holding office, there is *not* such a presumption of law as contemplated by the language contained in the request to charge. But the law, in this issue, does not make the presumption as contended for by defendant's counsel; the jury must look to the testimony submitted to them, and determine the case from the proofs. I am further requested to charge you, that if the plaintiff fails to make out his case in every point they must find for the defendant. I cannot charge you in these words, but I do charge that you must be satisfied, from the testimony before you, that the defendant has one-eighth or more negro or African blood in his veins, before you can find for the plaintiff.

The jury found that White was a person of color, having one-eighth of African blood in his veins. The Court then ordered that White should not in any manner intermeddle with or concern himself in and about the office, liberties, privileges and franchises aforesaid, but that he be absolutely forejudged and excluded from ever exercising or using any of them *in futuro*, and that he pay the costs, etc.

White's attorneys sued out a writ of error, assigning as erroneous the refusal of the continuance, the overruling of the demurrer, the allowance of so much of the testimony of Jackson and Young as was objected to, and of the copy application for insurance, the several clauses of the charge as given, and the refusals to charge as requested.

A. W. STONE, JAMES JOHNSON and A. T. AKERMAN, for White, made the following points and citations of authorities: The continuance ought to have been granted: Code, sections 3471, 3478. The demurrer should have been sustained: section 1, Art. 14; Constitutional amendment, section 3, of the same; Constitution of Georgia, section 2, Art. 1; sections 1 and 2, Art. 3; Code, sections 1648, 1649, 1650; sections 3, 4, 5, 6, Art. 2; section 3 Art. 3, and section 2, Art. 3, of the Constitution of Georgia; item 3, section 130, Code; Journal of Convention of 1868, pp., 150, 308, 311, 312.

THOMAS E. LOYD and JULIAN HARTRIDGE, for Clements, replied, the affidavit for continuance was not sufficient; it did not allege that the motion was not made for delay only, or that there was no other witness present by whom the facts could be proved: 10 *Ga.* 85. The Judge rightfully refused White's attorneys the opening and concluding argument on the demurrer. But if he was wrong, there is no ground for sending the case back, if his decision was correct as to the law points argued: 4 *Ga.* 460; 6 *Ga.* 310. The *status* of a person, as a slave or person of color, may be proved by general reputation, 20 *Ga.* 480. The testimony of Jackson, as to his acts as register, were admitted to raise a presumption against White of an admission that he was a person of color, and also to show reputation

Dr. Yonge is speaking as a physician, and one in office for the purpose of making examinations of the structure, condition, etc., of an applicant for insurance, and whose duty it is to certify whether such applicant is white or colored. He therefore testifies as an expert. It makes no difference that others may be as good judges as himself.

The copy of the application was admitted because the original was beyond the jurisdiction of the Court: 21 *Ga.* 219; 26 *Ga.* 537.

The fact that White is a citizen of the United States does not necessarily confer on him the right to hold office, 19 *How.* 422; 4 *Dev. & Batt.*, 26; 4 *Wash. C. C. R.*, 381. Nor does the fact that the Constitution of Georgia makes him a cit-

izen confer the right; for the same Constitution makes women and children citizens. Nor does the fact that the Constitution of Georgia makes him an elector confer that right to hold office. Nor does the clause of the Code which declares the rights of all citizens, and among them mentions the right to hold office; for another clause specifies the rights of persons of color, and does not mention the right to hold office. This latter clause circumscribes the first, by the rule of interpretation of statutes. Code, sections 1468, 1662; 1 *Bishop on Cr. Law*, section 78; *Dwarris on Statutes*, 2nd, p. p., 658, 692, 699, 703, 707, 713. As to *status* of colored persons before emancipation, 16 *Ga. R.*, 202.

McCAY, J.

Clements filed an information before Judge Schley, suggesting that at a recent election in Chatham county for Clerk of the Superior Court, he and White had been the only persons voted for; that White had received a majority of the votes, he himself getting a large number, and that White had been commissioned and was then in performance of the duties of the office; that, in fact, White was ineligible under the Constitution and laws, by reason of his having in his veins one-eighth or more of African blood; that *he*, Clements, was eligible, and praying that a *quo warranto* might issue, inquiring by what right White held the office, and if found ineligible, that he be compelled to vacate the office, and that he, Clements, be installed therein.

White was notified of this application, and filed a demurrer to it. Subsequently, however, that demurrer was withdrawn, and the *quo warranto* issued in the usual form, in the name of the State, calling upon White to show by what warrant he held the office. White filed a demurrer to this warrant, on the ground, in substance, that the fact of one having one-eighth or more of African blood, was not, according to the laws of Georgia, a disqualification for office, and also filed an issue denying the fact, as stated in the warrant, that he had such blood.

White *vs.* Clements.

Under the Act of 1868, a jury was drawn and summoned and impannelled, to try the issue. When the parties announced themselves ready, the counsel for White called up the demurrer, and proposed to argue it then. No objection was made to its being then heard, and it was set down for argument *instanter*. The counsel for the State, however, insisted that as they were before the jury they had a right to open and conclude, and so the Court determined, and the argument was had, the demurrer was overruled, a judgment was entered, and the Court proceeded to the trial of the issue.

On the trial, over the objection of White's counsel, the Court permitted the introduction of the following, amongst other evidence set forth in the Reporter's statement of facts:

First—that of the Register. Second, the copy of the life insurance application, and the various witnesses.

This case has been argued with great earnestness, ability and learning, and its high importance, as well as the strong personal feeling involved in its consideration, makes it a matter of deep interest. Involving, as it does, the *status* of a large portion of the acknowledged citizens of the State, and controlling, as it must do, to a great extent, the principles upon which hereafter our civil organization is to exist, we have come to its consideration with great seriousness.

Upon several of the questions made in the bill of exceptions, the Court is unanimous, and the judgment granting a rehearing is therefore equally so. Upon the question arising on the demurrer—the real vital question at issue, to-wit: the right of persons of color to hold office in this State, our brother Warner dissents from the conclusion at which the majority of the Court has arrived, and will doubtless furnish to the Reporter the reasons for his dissent.

1. The fact that the Register of voters had placed a "C" to indicate "colored" after the name of White, is not original evidence. It is mere hearsay, and may have been the simple opinion of the Register. It has not even the dignity of reputation, since it is but the statement of one man. It does not appear that this entry was one required by law to be made, nor that White knew of it, or was affected in his rights by it,

or that he could have had it corrected, had it been wrong. It is wholly worthless as evidence, being in fact, nothing but the opinion of one man, who is not, as far as appears, an expert.

2. The contents of a paper, beyond the jurisdiction of the Court, and not in the power of the party wishing to use it, may, without doubt, be proven by a proven copy. But it must be proven that such an original paper does or did in fact exist, and was duly executed. Here was no proof of the execution. The witness did not know whether White or his wife signed it.

3. We do not see that the paper was any evidence in this case, even if properly, in evidence. There is not a word in the paper showing that White is colored ; nothing in the nature of an admission to that effect. Indeed, in the paper there is not word on the subject. On the back of the paper it is stated that White is a mulatto, but this seems to be a mere *memorandum* of the company, not signed by White, nor does it appear that it was even made with White's knowledge.

4. We think there was no error in permitting the race of the defendant below, to be proven by reputation. Such is the law as laid down in the books, and the evidence is good for what it is worth. As a matter of course, it is worth hardly anything in a doubtful case.

5. An expert is one who by his habits of life and business has a peculiar skill in forming an opinion on the subject matter in dispute, and, without doubt, a physician who has studied the science of Ethnology, is better prepared than ordinary men to judge of the race of one presented for examination. And we think the Court did right in permitting the doctor to give his opinion as an expert. What it was worth was for the jury. Dependent on his intelligence and character, and the nature of the case, etc., we would think it worth very little in a doubtful case, as whether one had one-eighth or little less or more of a particular blood. All of the testimony in this case was very inconclusive. In ordinary parlance, one is called a person of color who has any visible admixture of negro blood, and it does not appear but that

White *vs.* Clements.

this was all any of the witnesses meant. The law under which it is *claimed* White was ineligible, did not disqualify one unless he had one-eighth or more negro blood. The whole Court is of the opinion that there ought to be a new trial, because of the error of the Court in admitting the statement of the Register, and in admitting the copy application for insurance.

6. We have no doubt but that the Court erred in permitting the council for Clements to open and conclude the argument in the demurrer. Perhaps, under this peculiar statute, which requires a jury specially to be summoned to try any issue of fact that has arisen between the parties, there might be some question whether the demurrer ought not to have been disposed of before the jury were summoned. But the demurrer was duly filed, it was called up by its mover, and no objection was made to the hearing of it at that time, and it was heard as a separate and distinct motion. The rule of Court is plain and positive. " In all special matters springing out of a cause the party submitting the point shall open. Rule 45. Why should this be different from another case? It was a distinct motion, made to the Court, with which the jury had nothing to do. For the purposes of the demurrer it admitted the facts set forth in the writ, and the jury had, so long as the demurrer was pending, nothing to do with the case. In what does this differ from a demurrer to a declaration, or to a bill in equity, filed at the first term, and not argued until the case is called for trial? Yet the practice is uniform, and so the rule of Court requires that the party making the demurrer shall open and conclude. In the argument the movant holds the affirmative. He says, you have no case in Court. If the Court agrees with him it *sustains* the demurrer. If the contrary, it overrules it. We would not however, grant a new trial, for this error. It is mere matter of practice, and had we thought the Court right in overruling the demurrer, we would not disturb the judgment.

7. Whatever may be the Constitution, the Code of Georgia, section 1648, provides that the right to hold office is one of the rights of a citizen of this State, and section 1649

provides that all citizens are entitled to exercise *all their* rights as such, unless specially prohibited by law.   No body denies that persons of color are citizens, nor does any body claim that there is any law specially prohibiting colored persons from exercising that right.   It follows therefore that by the laws of this State, persons of color may hold office.

But I am not myself satisfied to put my judgment in this case upon this ground.   I am well convinced that the fundamental law—the Constitution of the State—guarantees to men of color the right to be chosen to an office, and I put my own judgment upon that ground.

If the general principles, or any one of them, which I have placed at the head of this opinion, be true, this right is undoubtedly a fundamental one—one guaranteed by the Constitution, and not only exists, but exists entirely beyond the power of legislation.

Very much of the argument advanced at the hearing was based upon what, as I believe, is an utterly mistaken conception of the source from which rights in this country are derived.   It has been assumed that rights exist here by grant, and that the citizen has no rights save such as he is able to. show are granted to him by the Constitution, or by some statute, or as has been (very strangely to my mind) suggested, by *Common Law.*

Unless I have been mistaken all my life as to the nature of our State governments they are based upon the fundamental idea that the people of a State have all rights that are not expressly taken away.   The object of constitutions is not to give to the makers of those constitutions rights, but to provide against the infringement of rights given by God. For greater security and certainty, constitutions sometimes formally set forth certain rights, often in human history infringed, and guarantee them, but it is a new doctrine to me that the people get their rights from these solemn assertions of them.

The Constitution of 1861 was the first in this State that contained a bill of rights, and its accomplished author, Mr. T. R. R. Cobb, now in his grave, would be startled at the

suggestion that, in his condensed but explicit enumeration of rights, he was framing a grant to the people of Georgia.

A convention of gentlemen, elected by the people, and acting solely as their agents, met together to frame for that people a constitution, and it is gravely insisted that these agents, chosen and paid by their masters, the people, to suggest to that people a form of government, are the grantors of the rights which that constitution guarantees to the people. Such ideas are anti-American—the relics of that theory which is exploded now even in England, that rights come from the king as the divine repository of power.

The men who founded this government had different ideas They conceived of sovereignty as vested in the people, and their intent in framing constitutions was to build up safeguards against the encroachments of the governments they set up. If they mentioned any special rights, it was not to grant them, but to guarantee them; not to confer them, but to secure them. All our governments are the mere creations of the people, subject, at their pleasure, to be changed or abolished, and there is a species of .absurdity in speaking of rights granted to that people by themselves.

There is, I am aware, a class of men in this country whose minds are still running in the groove, in which they were set by Coke and Blackstone, the great expounders of the origin, progress, and principles of English liberty. This class of men conceive all rights as derived from *Magna Charta*, the Act of settlement, the Constitution, the Statutes of the State, or from the well established rules of the common law. Their theory is founded on the fact that the Kings of England had ursurped the rights of the people, and at various periods, they had compelled the usurpers to restore them, and as a salvo to his vanity, they had received them as grants from him, and now hold them, not by virtue of the great doctrine of *our* fathers, that human rights are the gift of God, but by virtue of the written grants which they are able to show from their soverign lord and master, by .the grace of God, king and depository of the rights of men, or from an

imaginary power they call the State, which they have set up in his stead.

By this theory, a free born American citizen has no rights save such as he is able to trace up to some old parchment, having the X mark of 'some one of these divinely appointed masters of the people, or can show is one of the few privileges that have always been allowed to the subject by the king. He must make out his case by *Magna Charta*, or some other grant from the sovereign or by the common law. And though this is a republic where the name of a king is unknown, yet not a right exists that cannot be traced back to some black letter grant, from some such august potentate, or can be traced from his successor, the State, who has been inaugurated in his stead.

It was very well for our fathers in making up their account against George the III, still to use this fiction in their enumeration of their causes for resistance. They were still at the time British subjects, and might well use that form of speech, by which such subjects assume that the gentleman or lady, whom for the nonce they have agreed to call king or queen, is the source of those rights which, in fact, they have won by their own right hands, from that king's or queen's predecessor, after *he* had by force or guile, taken them from those to whom God gave them. But when the war was over, and these colonies were declared independent of the mother country, and they came to set up governments for themselves, the fictions of the monarchy disappeared. If *Magna Charta and habeas corpus*, and the common law were of force, it was because the people adopted them of their own will, not as grants from the king, nor yet, as gifts from the State, but as convenient modes of expressing that these rights were especially to be secured, even against the thoughtless infringements of the people themselves, or what was the same thing, the new government which they set up. The theory of the origin of rights was changed, and men were now entitled to all rights which they had not denied to themselves, since it was the essence of absurdity, to say that a people under no contract but their own sovereign will, could meet and

White *vs.* Clements.

grant to themselves any rights.   Hence, under the American idea, constitutions and charters are not to give, but to secure, rights, not to grant but to guarantee rights, not to give to the people this or that privilege, but to restrain individuals from using rights not convenient for the public good, and to preserve against the encroachments of the government those rights inherent in the people which experience thought it was wise, specially, to guard.

But whilst but very few persons at this day, and in this country, will insist upon this idea as a general proposition, it is still said that the case of the negro stands upon a different footing, and that however it may be true, that the rights of a white American citizen came from God, yet a black American citizen cannot claim this presumption; that the rights of the negro have a different derivation, *they* come from the State, and he can have none, except such as he can show chapter and verse for.   As I understand it, this is the very sheet-anchor of the argument for the defendant in error.

The negro, they say, was, as all admit, a slave, without any rights, save such as were specially pointed out by law, and that having none, became free by special grant, he does not stand like a white man, with every right, that is not expressly denied, but with only such as are specially granted.   In other words, that hereafter in this State, we are to have two classes of citizens, one holding their rights by divine gift from the God of nature, in favor of whom there always exists the presumption that any particular right contended for, whether it be legal or political, and in reference to whom, the burden of proof is always against the party denying the right; and another class, whose rights come not from God, but from society, and who, in every contest respecting a right, must be able to show by special enactment, that the right has been granted.   At the close of our late civil war, when the defeated party, under the pressure of the circumstances then existing, recognized the freedom of the late slaves, some such idea was doubtless a common theory.   The Constitution of 1865, and the Legislatures, which for a year or two met under it, adopted a constitutional provision and enacted

various laws based upon this idea.  Con., 1865, Art. 1, sec., 21, Art. 2, sec., 5, par. 5.  These people, under that Constitution, and under the laws enacted thereunder, were called "persons of color;" the rights of that class, as they existed under the old system were enlarged and defined and protected, and a very evident design was manifested to keep up in the State, the destinction to which we have referred.  The colored population of the State, had no part in the Convention of 1865.  That body, though elected and organized and dictated to by the President of the United States, was a convention of the white people of the State, and without doubt met and acted on the theory, that colored men were not a portion of the people for whom the government was organized, but an anomalous class called " persons of color," who existed within our borders, but whose rights depended solely on the legislation of that class whose rights came from God.

And did this case arise under that Constitution, were the government of Georgia now guided by the theories and principles then acted upon, it would undoubtedly be true, that a "person of color " must always, in the assertion of a right, be able to point to the written law by which that right was granted.  It happens, however, that the Constitution of 1865, and the government organized thereunder, never went into practical effect, as the Government of this State, as one of the States of the United States.

The Act of Congress, of March 1867, passed nearly two years after the inauguration of Governor Jenkins, formally enacted that there existed no legal civil government in the State, placed its government in the hands of the military authorities, with permission to those authorities to use as their discretion, and as a provisional civil government, such organization as they might find in existence.  It is not pertinent to the present argument to go into the question of the power of Congress to pass that law.

My own opinion is that its power to do so, turns entirely upon the question of the right of the State to secede from the Union.  If that right did not exist, then the govern-

White *vs.* Clements.

ment set up in 1861, was illegal, and when the result of the war annihilated it, the State was without any legal civil government at all  It was in anarchy without any government, and consequently, without any republican government, and the case arose provided for by Art. .4, section 4, of the Constitution of the United States, whereby, it is made the duty of the United States to guarantee to each State a republican form of government.  In what mode this shall be done is not pointed out.   It is left to the discretion of the lawmaking power, restrained and controlled by the general principles of the Constitution.   One of the very first requisites for the exercise of such a power, was the preservation of the peace, and the protection of life and property, until such a government could be organized, nay, it was one of the necessities of the process of such an organization, and as the Government of 1861 had been overturned by military power, and that military power, with more or less directness, had since May, 1865, performed, in its way, these duties, there was perhaps no constitutional objection to authorizing, by statute, such a jurisdiction over civil affairs, as ever since May, 1865, had in fact been exercised under the orders of the President.

If a Convention might in 1865 have been called by the President; if the Executive power of the United States, might, as a means of guaranteeing to the State a republican government, by his proclamation appoint a provisional governor, and by the military authorities preserve the peace and protect life and property, during the process of organization; if by his proclamation he might lawfully call a Convention, fix the number of its delegates, and the basis of representation therein ; if he might fix a day for the election, determine the qualification of the voters, excluding unpardoned rebels and negroes ; if he might, in other words, lawfully do, as was in fact done, in 1865, by Mr. Johnson, surely it was no great stretch of constitutional power, if Congress, dissatisfied with the result of that Convention, and unwilling to accept its work as a performance of the duty of the United States to guarantee to the State a republican government, should itself, by formal law, provide for the calling of another Con-

vention, and authorize, as the President had done, the pres-
ervation of public order by the military authorities until this
could be done.   As I have said, the rightfulness of this ex-
ercise of power, turns, in my judgment, upon the right of
the United States to prevent, by force of arms, the secession
of a State from the Union.

If that right exists, if, in the late war, the United States
was not the aggressor, and if the government set up in 1861
was an attempt at revolution, if the nomenclature by which
the late war is called a rebellion be correct, then at the close
of that war, when the late Governor of the State, was a pris-
oner at Washington, and in the whole civil organization
there was not a single officer capable, under the Constitution
of the United States, of performing an official act, it seems
to me to follow, that though the State, as one of the States
of the Union, still existed, she was wholly without civil
government, not as some suppose, without law or rights as a
State, but without any civil machinery to put those laws in
force, or to exercise those rights, and there arose an absolute
necessity to appeal to the people in their sovereign capacity,
in order that a new civil organization might be effected.

Obviously, under the circumstances, this appeal could only
be made by the United States.   By the Constitution, the
State had formally provided that if such a case should arise,
if by any trick of ambition, a monarchy should be set up, or
an aristocracy inaugurated, or, if—as I suspect was, at the
making of the Constitution, the danger most feared—faction
should breed anarchy, in either of these cases, it was not only
a granted right, but it was made the solemn duty of the
United States to guarantee to the State a republican govern-
ment.   An appeal to the sovereignty of the people was clearly
the mode most in harmony with American ideas for the per-
formance of this duty, and just here, in my judgment, is the
point of the argument bearing upon the case before the Court.

The complaint made by the United States against the Con-
vention of 1865, was that *it* did not represent the *people* of the
State, that *it* was a Convention only of the white people, and
that the whole theory upon which it was called, elected and

organized, and upon which it acted, was wrong; that it was an appeal, not to the people, but to the white people, and that the government it set up, was not a republican one, for the reason that it proceeded upon the very idea now set up by the argument here insisted on by the defendant in error, to-wit: that the negro was not one of the people, for the protection of whose rights, the government was set up ; that it was based upon the very idea here·contended for, that ·white men's rights came from God, and the guarantees of the Constitution do not grant, but protect them, but that the negro's rights came from society, and he has only such as society has been pleased to give him.

It cannot, I think, be doubted that the very object and intent of the reconstruction laws, was to repudiate this idea, to consider the colored people of the State as a part of the people, for the *protection* and *guarding* of the sovereign people—having rights given, not by men, but by God—that gave birth to, and formed the whole warp and woof of the Congressional scheme of reconstruction.

And, accordingly, and under those laws, the colored men of the State participated equally with the whites in electing the Convention, men of color sat in it as members, and whites and blacks met equally at the polls to vote upon its ratification or rejection.   The people of Georgia, without distinction of color, came together at Atlanta, in December, 1867, by their delegates, to form for *themselves* a Constitution and frame a government, men of both colors sat as delegates in the Convention, and in April, 1868, the work of that Convention was submitted to, and ratified by that people, and yet · it is contended that the rights guaranteed by that Constitution, stand, as to the two colors, on a different footing, that as to the white man, they are mere securities, but, as to the negro, they are grants ; that now, and hereafter, one portion of the sovereign people have all rights which that Constitution does not take away, and another portion have only such as are expressly given.

Nearly three-fourths of those who voted for delegates to the Convention, were blacks ; the white people generally re-

fusing to vote, and on the question of its ratification, three-fourths of those who voted "yea," were blacks. How could these black people, voters for delegates, grant rights to themselves? What a perfect contradiction of terms, does the whole nomenclature result in. The delegates of the people, *without distinction of color*, meet in Convention, and *grant* to *men of color*, certain rights, and the people, without distinction of color, ratify the grant. The men who *get the grant* are the very men who select the delegates to frame its terms, and who ratify it as the final judges of its wisdom and propriety. The whole thing is absurd, a perfect contradiction of terms.

By the theory of the Reconstruction Acts, people of color were recognized as free, as having the rights of freemen, as forming a part of the sovereign people whose right it was to join in framing for their common government, a Constitution, and as entitled by the laws of nations to every right which the people, themselves included, should see fit not to take away, and it is a direct stultification of the whole basis of those laws, of the fundamental idea upon which the Constitution of 1868 was elected, organized and acted, to apply to its provisions, the presumptions and theories of a Constitution which called them "men of color," and explicitly recognized them, not as a part of the people, the body politic, but as subjects of the governing and controlling whites.

If this doctrine be true, if the negro's rights lie in grant, if he have only such as vest in some formal declaration of the State, which in this theory stands in the place of the king, from whom, as from a fountain, all rights flow, then the appeal of the United States to the negroes as a portion of the body politic, was illegal and void. He had at that time no political rights to be protected by a government. He formed no part of the sovereign people, in whom rests the power to form and alter political organizations. He had no rights to grant to anybody, and the whole proceeding was as though one should attempt to raise himself to a height by pulling at the straps of his boots.

In my judgment, the Convention of 1868 met as the

representatives of all the people of this State, white and black, and met upon the basis that they all had equal rights. The white people had, most of them, long enjoyed the rights of freemen. They too had once felt the clank of the chain of a master, but, in the providence of God, they had, many a day since, felt it no more. The colored people had but lately been slaves, but both classes were now free, not by grant, but by that "*ultima ratio regum,*" the law of arms, which cares but little for parchments and statutes, and they met as free men, as all forming together the body politic, the State, to form a government for the guarantee and security of those rights, which by the fundamental theories of American society, have been given by the God of nature to his creatures.

Without doubt, many of our wisest and best men indignantly deny that in this proceeding there was the least legality. There is hardly any language too strong, by which, as they think, it ought to be characterized; illegality, tyranny, usurpation, oppression, are the words which they daily apply to it. But it is none the less a fact, a patent, active, incontestible fact, upon which, whether rightly or wrongfully, the present State government is founded, and the denial of which strikes at the very root of the authority by which this Court takes jurisdiction of the case before us. Nay, if the negro was not at the *calling* of the Convention of 1868 a portion of the body politic, a part of that people, in whom rests the sovereignty of the State, if it was necessary that the right to participate on equal terms with white men should be *granted* to them; if, in other words, the presumption contended for, be true, then the defendant in error, has, himself, no *status* in this Court, since he is seeking to hold an office created by those very colored people, in utter violation of the presumption he sets up.

If the negro in 1868, before the Convention met, was not clothed with equal political rights with the white man; if it required the grants of the *State* to clothe him with those rights; if, as to him, the enumeration of rights in that instrument are grants, whilst as to the white man, they are mere

securities then, since the Convention of 1868 was elected almost entirely by negroes, and since negroes participated equally in its organization and deliberations, and since they were a portion of the people who were appealed to for its ratification, the whole thing was itself illegal and void, this government is a usurpation, this Court is illegal, the Chief Justic ought to be in his seat as the Governor of the State, my Brother Warner and myself are private citizens, the plaintiff in error is a slave, and the defendant in error is seeking to hold office under an outrageous and gigantic usurpation.

I am not disposed so to stultify myself. I do not feel inclined to put my judgment on a ground, which, if true, makes my own position on this bench illegal, nor am I able to see how any man who insists upon the presumption contended for, can accept office under a government whose very existence is based upon exactly the opposite theory.

I have dwelt somewhat lengthily on this point, because in my judgment, it is important that we should thoroughly understand to what future results this rule of construction would lead us. He who adopts this presumption; he whose theories derives the white man's rights from God, or from nature, or from custom, and the black man's from grants and Constitutions, and who, therefore, presumes that the former has all rights that are not denied, and the latter only such as are expressly given, not only sets afloat, for agitation at home, and for national interference, questions which it was the intent of the reconstruction policy to settle, but he appeals to a Court organized upon a principle directly the opposite, and asks it to uproot the very foundation on which it rests.

This whole government exists, as at present organized, by virtue of the presumption that colored men were by the laws of nature, a portion of the sovereign people. This Court, as the other departments of the State government, gets its powers from them, the rights of all colors are restrained, protected, and controlled by a Constitution they have made, and shall it be said that under that Constitution they have only such rights as they have seen fit to grant to themselves, that

White *vs.* Clements.

the authors of the grant are to be presumed as dependent upon the grant for the rights and privileges specified in its terms. It seems to me that this is folly, an acceptance of reconstruction and a repudiation of its terms. As one of our new States, though it comes into being by virtue of an Act of Congress, as an organization, as one of the States of this Union does, yet as soon as it dons the robes of State sovereignty, immediately become a coequal sovereign, under the fundamental basis, with the States existing before it, and from whom it derives its power, and as a *subject of* the imperial Czar of all the Russias, when, by the laws of the United States, he becomes a citizen, forthwith is recognized as having derived from God rights equal with the native, and as entitled in every investigation to equal presumptions with his other fellow citizens, so the negro, slave though he has been, when the national government *recognized* him as part of the sovereign people of the State, and called upon him to join in the making a Constitution, and appealed to him after that Constitution was made as one of the judges of its wisdom, and for the purpose of getting his consent, is entitled to the same presumptions as are his other fellow-citizens, and the adoption of the theory contended for—that one class of our people have rights derived from the God of nature, which Constituions and laws only protect, and another class have rights derived only from society, which must always be proven by the production of the grant—is fatal to the very existence of the Government of Georgia as now organized.

There is some show of logic in one who refuses to admit that the present government is a legal one, thus adopting the fundamental ideas of that organization, upon the ruins of which the present one stands, but an officer of the present government, one who, as does the defendant in error, proposes to become, by taking office, a part and parcel of this organization, based, as it is, upon the theory that negroes are part of the sovereign people of the State, as it seems to me, makes a fatal stab in the very vitals of the institutions of which he proposes to become an officer.

The whole argument of the plaintiff in error is founded on a false theory, and however true it might be ten years ago, or in Great Britain, or even in Georgia, under the Constitution of 1865, it is wholly untrue now under this Government, and to hold it true is to strike at the very root of the principle on which the government of Georgia, under the Reconstruction Acts, is based. And if the rights of the negro are, as are the rights of the white man, under the present Constitution, which was made equally by and for both colors, presumed to exist, unless they be formally taken away, then the conclusion is irresistible that the plaintiff in error is eligible, since it is not pretended that in the Constitution of 1868 there is any denial of his eligibility. The argument against him being wholly negative, and the true rule requiring a positive argument, his eligibility remains, simply because there is nothing produced which denies it. If the negro cannot hold office because there is nothing in the Constitution granting him that *right*, neither can the white man, since there is nothing granting it to him. If, however, the true theory of the source of rights be, that every citizen has equal rights, unless there be some denial in the Constitution of special rights, then in this State negroes may hold office, since the Constitution does not make color or race a disqualification.

It has been very seriously argued that the rights of a white man to hold office, though not granted in the Constitution, exists by *Common Law*, and did not need a grant. If, by common law is meant the *usage* of the State, I would enquire of them, was any such usage at the origin of the State—at the foundation of the Government? When the colony of Georgia became independent of the mother country, when a republican government was set up here, nothing is better settled than that white men were understood to be eligible to office, except as otherwise expressly provided. This included all citizens, naturalized citizens as well as others.

One of the qualifications of President of the United States is that he must be a native born citizen, and incontestibly were it not for this provision a naturalized citizen might, if

White *vs.* Clements.

elected, hold that high position. It is absurd to say that there was a usage in a government not yet set up. Nor is there in fact in this State any such authority for a right as usage or custom. Our Constitution specifies our laws. They are the Constitution of the United States and its laws, our own Constitution, and the Statutes of the State, and the Common Law of England. Usage, custom, is not in this State a source of law, and a right dependent on that has no *legal* dependence. By the "common law" must therefore be meant the law of England. Though it is very strange how the common law of England could make a naturalized citizen eligible to the office of President of the United States if the exception requiring him to be a native born citizen had not been introduced into the Constitution. By the law of England all native born citizens were eligible to any office, unless there was by law a special disqualification. Even the very highest office—sovereign—might be filled by a woman or an infant.—BLACKSTONE.

But, by the common law it was a well settled rule that a naturalized citizen, even though naturalized by Act of Parliament, was ineligible to any office. He could not hold even the humble place of constable, and so it has been solemnly determined by the Courts of England.—BURR. Where then does the naturalized citizen get his right to hold office? He was not born to it, for he is not a native. It did not exist at "common law," because the common law was directly the other way; *it* affirmatively denied to him the right. He does not have it until he is naturalized. Whence, then, is it derived, and why was it necessary specially to provide in the Constitution of the United States that the President must be a native born citizen? And why, too, the frequent provision in our State Constitution requiring a specified residence as a qualification for office?

Is not the answer an obvious one? A naturalized citizen stands upon the footing of other citizens, and he has all the rights that anybody has—unless it is otherwise specially provided by law. By the grant of the State, he has become one of the people, and, *ipso facto,* his rights stand upon pre-

VOL. XXXIX—17.

White *vs.* Clements.

cisely the same foundation as do theirs.    He is one of them for whose use and protection the government is made; and he, like them, has every right which the people have not by some affirmative law denied.    Why is not this also true of a person of color?    True, he was born a slave; it is equally true that a Russian was born a subject.    True, even when free, the negro in this State had only such rights as the law gave; but the Russian, before naturalization, was in the same position—his rights were dependent upon the comity of the State, and he had only such as that comity bestowed upon him.    But when, by the will of the people, the Russian subject becomes a citizen, *ipso facto*, his relations change, and he, like other citizens, has every right that is not denied him by affirmative provision.

I cannot, for the life of me, see why this same thing is not true of the negro.    Having become one of the sovereign people, he is presumed to have, as have they, all rights not specifically denied.

Thus far, we have discussed this question on the idea, that the Convention of 1868, being composed of the agents of the black as well as the white people of the State, the Constitution which it formed must, in the very nature of the case, be construed on the theory that it grants no rights to men of either color, but only specifies, and protects, and guarantees against encroachment, those inherent rights of self-government which, by the fundamental principles of American society, are inherent in the sovereign people, by whom, and for whom, the Government is made.

But assuming, for the purposes of the argument, the strange theory, that the Convention of 1868, representing, as it did, the black as well as white people of the State, *granted* to the black people certain rights, it is very plain to my mind, that the Constitution of 1868 guarantees and secures to persons of color the right to hold office.    Article 1st, section 2d, of that instrument is in these words: " All persons born or naturalized in the United States, and resident in this State, are hereby declared *citizens* of this State, and no laws shall be made or enforced, which shall abridge the privileges and

immunities of citizens of the United States, or of this State, or deny to any person within its jurisdiction the equal protection of its laws.    And it shall be the duty of the General Assembly, by appropriate legislation, to protect every person in the due enjoyment of the rights, privileges and immunities guaranteed in this section." It may be observed in passing, that there is no pretence here of *granting* rights to anybody ; the language used is, " are declared to be citizens," and " rights guaranteed."

But assuming that, as to the negro, these words are to be understood in the sense of grant, and given, let us inquire what is their proper and legitimate meaning.    Without doubt by this article, they are citizens, and " citizens " of this State. Under this theory, having been slaves, they acquired, by revolution and military power, freedom.    By the Act of 1866, which is almost word for word, the Act of Congress, known as the Civil Rights Bill, they acquired equal civil rights with white persons.    They had still no political rights. The Fourteenth Amendment was not, at the time this Constitution was made, ratified and adopted.    They were yet only " persons of color."    This section of the Constitution of 1868, takes another step—they become citizens—they *grant* to themselves the character of citizens.

What is its effect ?    What is the meaning of this word ? Our English law books rarely, if ever, use it to describe the relation of the people to the State.    Englishmen are subjects, not citizens, and we must seek from other sources than from Coke and Blackstone, the meaning of this term so frequently uttered and written in America.    The word is derived from the Latin *civis,* and meant in Rome one vested with the freedom and privileges of the city.    Rees' Encyclopedia tit. citizen.

Butler, in his *Hora Judicæ,* says, " Citizens were the highest class of subjects at Rome, to whom *jus civitatis* belonged, and those who had it possessed all rights and privileges—civil, political and religious." *Hora Judicine,* 26th and 27th.

The *Dictionaire L'Academie les Citoyen* defines it thus:

" In its strict and rigorous sense, an inhabitant of a city, who, by right, may vote in the public assembly, and is a part of the sovereign power." Johnson defines it, "a freeman of a city." Webster: "The native of a city, or an inhabitant who enjoys the freedom and privileges of a city in which he resides—a freeman of a city distinguished from a foreigner, or one not entitled to its franchises."

The word is never used of the people in a monarchy, since it involves an idea not enjoyed by subjects, to-wit: the inherent right to partake in the government. The republics of the old world were cities, and the word citizen has been usually in human history only applied to inhabitants of cities. As, however, States have, in modern times arisen, and Republics have been established, in which the word subjects could not be properly applied, the people of those Republics have been called citizens, for the simple and obvious reason that their relation to the State was such as was the relation of citizens to the city. They were a part of its sovereighty— they were entitled to its privileges, its rights, immunities and franchises. As this word was used of mere municipal corporations, it meant strictly one who possessed *inalienably* all the rights, civil, political and religious, enjoyed by any one in the city. The city, itself, being only a corporation, could not by its by-laws infringe or qualify those rights, since they were given by the charter.

When, however, the word came to be used of the people of a State, who are themselves the sovereign, this perfect equality in the rights of citizens ceased. The people themselves are bound by no charter, and they may, by affirmative enactment, qualify, restrain, and restrict the rights of citizens, and perhaps none of the definitions in the books are precisely applicable to the condition of citizens in the United States. Nothing is more common in this country, even in our most solemn public papers, than to apply the word to persons who are not in fact in the enjoymont of equal rights, either civil or political, with other citizens.

Infants and women are citizens, and they have, in none of our States, the right to vote; nay, they are denied by law

many civil rights. Infants cannot contract, nor make wills, neither can married women. And there is hardly a State of the United States in which male citizens of full age, are not denied various political as well as civil rights.

The right to vote is often restricted by a property qualification, and even the civil right of making contracts and being a witness in the Courts, is denied, by reason of crime, interest, or want of capacity. Has, then, the word citizen no definite meaning at all, in this country? It is very clear, that all citizens have not the same political rights, it is eqally clear that they not all equal civil rights.

Chief Justice Taney, in the case of Dred Scott, says that : "It is synonymous in the United States with the word people. A citizen is one of the "people." He is a part of the sovereign power, and is entitled to every right, civil and political, which the sovereign power has not in some affirmative way denied to him.

This denial must be affimative. If the right referred to, be one protected by the Constitution of the United States, then even the sovereign people of the State, in convention met, cannot deny it. As to other rights, civil or political, the people, the citizens, the State, may restrain and qualify them at pleasure. If they be protected by the Constitution of the State, they are free from legislative interference. But unless this be done, they may be regulated, restrained, qualified or denied, at the pleasure of the law-making power. The definition we have suggested covers all this. A citizen of a State is one who is entitled to every right enjoyed by any one, unless there be some affirmative declaration to the contrary, by some authority clothed with the power, under our form of government, to make the exception.

And this the definition of the Code of Georgia. Section 1648 of that Code enacts: "Among the rights of citizens are the enjoyment of personal security, of personal liberty, of private property and the disposition thereof, the elective franchise, the right to hold office, to appeal to the Courts, to testify as a witness, to perform any civil function, and to keep and bear arms." And section 1849 enacts, "All citi-

zens are entitled to exercise *all* their rights as such, unless specifically prohibited by law."

Here is a clear, definite specification of certain rights, which belong to citizens as such, and then a solemn declaration, that all citizens are *entitled* to exercise all their rights, unless specially prohibited by law. Those clear-headed lawyers and polished scholars, Mr. T. R. R. Cobb, Judge R. H. Clark, and Judge Irwin, the authors of the Code, have given exactly the definition of this word, that covers the state, of the rights of citizens in this country, and the Convention of 1868 had this definition before it.

Here is a solemn law of the State, defining the meaning of the word citizen. Is not this Court bound to presume, that the Convention of 1868 used the word exactly in the sense of that definition? Admit that the word has a different sense, as used by lexicographers, or as used by writers upon public law, is not the conclusion irresistible, that the Georgia Convention used it precisely in the sense given to it by express definition in the Code, which they adopted as the law of the State? Let it be remembered, too, that this definition of the word is one that harmonizes completely with the exact state of the actual rights of citizens, as they are enjoyed, and always have been enjoyed, in America.

It does not say that all these enumerated rights are enjoyed by all citizens, that every citizen has them, and that every citizen has a guaranteed right to their enjoyment. It takes up the matter as it in fact exists, and draws from the known, settled usages and practices of the country, a definition which exactly expresses the true state of the case.

A citizen is one who, unless it is otherwise expressly provided by law, is entitled to the rights mentioned. As a matter of course, the word law is to be taken in its known signification. If the right in question be one guaranteed in the Constitution of the State, then an Act of the Legislature cannot deny it. If it be guaranteed by the Constitution of the United States against even the State, then even the people in Convention met cannot infringe it.

I conclude, therefore, that when the Convention of 1868

White *vs.* Clements.

declared that all persons born in the United States, resident in this State, were citizens of this State, they intended to say that the persons enumerated were declared to possess among their rights, "the right to hold office," and that each of them was entitled to exercise the right, unless "specially prohibited bp law."

Very absurdly, in my judgment, is it replied to this argument, that the Convention could not have had this meaning, because they, in a subsequent part of the Constitution, conferred upon persons of color the right to vote, and they would not have done this, if the right was covered by the word "citizen." I say, this is absurd, because it assumes what is directly contrary to the fact. Had there been no suffrage clause in the Constitution, the right to vote would have stood on the same footing with black men as it did with white men. The objects of the suffrage clause is not to grant, but to protect the right.

Assuming, therefore, as I think it has been clearly shown we must do, that the Convention of 1868, by declaring persons of color "citizens," recognized them as belonging to that class of persons who are presumed to have all rights not specifically denied by the proper power in whom is lodged, under our system, the right to restrain them, it remains but to inquire if there is any affirmative provision denying to persons of color the right to hold office? Nobody pretends this. It is true that under our old system negroes could not hold office, but it was not by virtue of a provision of law denying to them that specific right, for it is a significant fact that there never has been, at any time any law in this State denying to persons of color any specific right. They were not and could not be *citizens*—they were persons of color, and in the denial to them of the right to be citizens was included the denial of every right not specifically, and by name, by law conferred upon them. And when they were recognized as citizens, *ex vi termini*, they became entitled to the exercise of every right not specifically by law denied to them, since it was formerly true that they had not these rights, not by virtue of any specific denial, but by virtue of

the fact that they were not and could not be citizens. If the denial to them of the right of citizenship, *ex vi termini*, denied to them every right not specifically granted, surely it necessarily follows that when this bar is removed, and the right of citizenship distinctly recognized, or even conferred, they become entitled, as other citizens, to every right not specifically by law denied.

We come now to the inquiry : Is this right protected in the Constitution from infringement? We have admitted that it does not necessarily follow that one who is a citizen has a right to *exercise* all the rights exercised by any citizens. We have admitted that it is in the power of the people, by proper methods, to deny to any citizen or class of citizens, any right. But that denial must be made by the proper authority.

Certain rights of citizens, the State, the people, the sovereign power, has contracted with the United States, shall be beyond their power. Such rights can only be denied after a change of the Constitution of the United States. Other rights of citizens, the people, the sovereign power, the State, has solemnly provided in the fundamental law shall be sacred from infringement by ordinary legislation, and these rights can only be denied after the Constitution of the State shall have been altered. Other rights of citizens are subject to denial by the ordinary law-making power, since the people, in their Legislature, have all rights not denied to them by the Constitution of the United States, or of the State.

Constitutional guarantees are either expressed or implied. Art. 1, Sec. 8, of the Constitution of the State, which declares that no person shall be put in jeopardy of life or limb more than once for the same offence, is an instance of an express guarantee. But there are implied guarantees which are just as inviolable as are those expressly enacted. The Constitution does not, for instance, in express terms, forbid the Legislature from adding new classes to the class of electors. It says that every male citizen twenty-one years of age, etc., shall be deemed an elector, but it does not say that none others shall be made such.

White *vs.* Clements.

The very fact, however, that the Constitution declares certain persons entitled to vote, is, by implication, a denial of that right to all others, and when it declares that certain things shall disqualify a citizen from exercising the right to vote, it by necessary implication, prohibits the Legislature from adding new disqualifications. So, too, if the Constitution prescribes a qualification for an officer, it by necessary implication denies to the Legislature the power to fix new and other qualifications.

"The expression of one thing is the exclusion of others," is a settled and sensible rule for the construction of Statutes and Constitutions.

The Constitution of 1868 provides, that no person convicted of treason, embezzlement of the public funds, malfeasance in office, crime punishable by law in the penitentiary, or bribery, shall be permitted to vote. Would it be competent for the Legislature to provide any other disqualifications? Could it, for instance, provide, that one convicted of a mere misdemeanor shall not vote? The same clause provides, that idiots and insane persons shall not vote. Could the Legislature provide that persons who cannot read shall not vote? Very clearly not. And yet there is no express provision denying to the Legislature this power, nor is there any express guarantee of this right to those who cannot read. The exercise of such a power is forbidden to the Legislature, by the very fact that the framers of the Constitution, by entering upon the subject of the qualifications of voters, by declaring that certain persons shall vote, and certain others shall not vote, have expressed the sovereign will upon the whole subject, and though there is no express denial to the Legislature of the right to add new classes, or to fix new disqualifications, yet by necessary implication the right is denied.

Precisely the same thing is true as to the right to hold office. Had the Constitution said nothing about it, it might fairly be presumed that it was a matter of legislative discretion. But this not the case. There are special disqualifications for various officers. The Governor must have been a citizen of the United States fifteen years, of the State six

years, and be thirty years of age. The Judges and the At-torney General must have been three years citizens of the State, be thirty years of age, and have practised law three years. Senators must have been citizens of the State two years, and one year a resident of the district. Now, can it be for a moment pretended, that it would be in the power of the Legislature to add more qualifications to those fixed by the Constitution. Could it, for instance, require a property qualification for either of these offices? The bare fact, that the Constitution enters upon the subject, and fixes any quali-fications or disqualifications, is an implied prohibition to any legislative interference.

So, too, when by section 3, article 2, of the Constitution, it is provided generally, that no person convicted of felony or larceny, before any Court of this State or the United States, shall hold office; and when, by section 4, that no person who is the holder of public money shall be elgible to office; and by sections 5 and 6, that no person, engaging in a duel, or who has been convicted of treason, embezzlement of the public funds, malfeasance in office, crime punishable by law with imprisonment in the penitentiary, or bribery, or who is an idiot, or insane, shall hold office, it is irre-sistibly implied, as it is in relation to the right of voting, that the mention of certain qualifications and disqualifications excludes all others, and it is not in the power of the Legis-lature to enlarge the list. All citizens, not by the Constitu-tion prohibited, may vote; and all citizens, not by the Constitution prohibited, may hold office.

I am aware, that it is replied to this, that there are some offices, which the Constitution does not prohibit to women or to infants. For most offices, where special qualifications are used, the masculine gender is the term used to express the office; and perhaps every officer mentioned by the Constitu-tion is expressed by a term masculine in its nature; and for most offices, it is expressly required that the holder of it shall be twenty-one years of age.

But I doubt not, there are offices which the Constitution does not deny to infants and women; and in my judgment,

if the people see fit to choose them for such positions, it is not in the power of the General Assembly to prohibit it.

Nothing is more absurd, to my mind, than the idea so prevalent, and so often and so zealously insisted on, that, because the Constitution does not declare a person ineligible to an office, it follows, as a matter of course, that the offices are to be filled by that class. One must be chosen to an office before he can hold it; and the only effect of a constitutional prohibition is, that thereby the people have restrained themselves from *choosing* the ineligible person.

Women are elibible to office in the Government of the United States, except in those cases where the term describing the office is masculine, for the simple reason that sex is not made a disqualification. Yet, how rarely have women held office.

It is not required by the Constitution of this State that the Governor or Judges shall be able to read and write; yet, no great evil results from the omission. The great, and the best, protection against improper officers, is not constitutional instructions upon the right to choose particular persons, but upon the wisdom and good sense of the choosing persons.

But, to my own mind, there is a stronger argument in favor of the plaintiff in error, than any we have yet insisted on. Ineligibility to office involves, not so much the denial of a right in the individual to hold the office, as the right of the choosing power to select him. The object of constitutional restrictions is, not so much to put the individual under a ban, as to restrain the choosing power. Indeed, the very word used, "eligible," refers as well to the chooser as ot the chosen.

The Governor of the State is clothed by the Constitution with the power to appoint to certain offices—it is an Executive power—one the Legislature has no power to interfere with. He is required to appoint Judges, etc. The Constitution restricts him in his appointments to certain classes. It says he shall not choose such and such persons. Is there any other limit upon his powers than the Constitution? He, under the Constitution, has a *right* to appoint. Would not

an Act of the Legislature, declaring he shall not appoint this or that class of persons, be an infringement of his rights? Within the limits of the Constitution, he has a right to appoint any one he sees fit. Would not a law restricting him in his choice to a certain class, violate his rights, infringe on the Executive powers solemnly confided by the Constitution, and solemnly protected in the Constitution against legislative interference? So, too, where is the limit to the right of the people to select? Nothing is better settled than that the people have all rights they have not denied themselves. Within the limits of the Constitution they may choose anybody. It may be a bad choice, but it is legal. There is no restraint upon *them*, unless it be by positive law.

The exercise of the duties of an office is not in this country as it often was in England, a privilege of the office-holder. Our theory is that offices exist for the public good, and it is the duty of one called upon to choose, to select such as all the facts show to be the most fitted. Every restriction on this power is a restriction on the rights, the natural rights, of the voter or chooser, and to make out a case of ineligibility, you restrict, not only the rights of an individual to be chosen, but of the chooser to select. If you admit that all white men have every right that is not denied them, the white voter has a right to choose anybody whom the Constitution does not declare ineligible.

One word in conclusion upon the general subject. The right of the people, if they please to choose a colored man for an office, is a necessary incident to the right to vote. The right to vote is worth but little to the colored man if he is restricted in the exercise of that right, so that he can only vote for men of a white color. Suppose the white men in his county are all opposed to such measures as he deems necessary for the public good, the limitation of his vote to persons only of a white skin, is not only an infringement of his right to vote, solemnly guaranteed in the Constitution, but dangerous to his liberties. What is his right to vote worth if he can only cast it for those ready to legislate against him? It is a mistaken view of human nature to suppose

White *vs.* Clements.

that, because ignorant men are not ineligible to office, that they will be elected to office. Intelligence and influence necessarily controls ignorance and dependence. There is no need for any law to aid in this control. All experience show that the strong will control the weak, no matter what is the law. True wisdom consists in adding to the power of the weak, and restraining the strong. They, the strong, the independent, the rich, are in no danger. Under all circumstances the danger is to the poor, the ignorant, the weak, and if under any system of laws, they get anything like a fair chance, they will have better luck than the poor and ignorant ever yet have experienced. It is better, even for the strong, that they shall be restrained in the exercise of power over the weak, since human selfishness is very grasping, and even a worm will at last resist.

. We have in this State, a large class of colored people; true, they are almost universally poor and ignorant, but they form a portion of the body politic, they are subject to the laws and can only be controlled by the laws. In the end, if those laws are unfair, unjust, unequal, they will breed discontent and disorder, and it is better for the peace and good order of society that all shall have equal rights. Even then the strong, the rich and intelligent, will have incalculable advantages over the poor and the ignorant, and need have no fears.

BROWN, C. J., concurring.

The view which I take of the rights of the parties litigant in this case, under the Code of Georgia, renders it unnecessary for me to enter into an investigation of the question : whether the Fourteenth Amendment of the Constitution of the United States, or the second section of the first article of the Constitution of Georgia, which, in substance, is identical with the Fourteenth Amendment, confers upon colored citizens the right to hold office. . If the respondent in this case acquires the right by grant found in either of the said' Constitutions, or in the Code of this State, it is sufficient for all the purposes of the case at bar, and entitles him to a

reversal of the judgment of the Court below, which was adverse to his right.

The third paragraph of the ninth article of the Constitution of this State adopts, in subordination to the Constitution of the United States, and the laws and treaties made in pursuance thereof, and in subordination to the said Constitution of this State, the "body of laws known as the Code of Georgia, and the Acts amendatory thereof, which said Code and Acts are embodied in the printed book known as Irwin's Code," "except so much of the said several Statutes, Code, and Laws, as may be inconsistent with the Supreme Law herein recognized."

The Code, section 1646, classifies natural persons into four classes : 1st. citizens, 2d. residents, 3d. aliens, 4th. persons of color. Section 46 of the Code declares that, all *white* persons born in this State, or in any other State of the Union, who are or may become residents of this State, with the intention of remaining herein ; all *white* persons naturalized under the laws of the United States, and who are, or may become, residents of this State with the intention of remaining herein ; all persons who have obtained a right to citizenship under former laws, and all children wherever born, whose father was a citizen of this State at the time of the birth of such children ; or in case of posthumous children at the time of his death, are held and deemed citizens of this State. By the Code the distinction is therefore clearly drawn between citizens who are *white* persons and persons of color. In other words, none are citizens under the "printed book known as Irwin's Code" but white persons. Having specified the class of persons who are citizens, the Code proceeds, in section 1648, to define some of the rights of citizens, as follows :

"Among the rights of citizens are the enjoyment of personal security, of personal liberty, private property and the disposition thereof, the elective franchise, *the right to hold office*, to appeal to the Courts, to testify as a witness, to perform any civil function, and to keep and bear arms."

Section 1649 declares that, " *all* citizens are entitled to

exercise *all* their rights as such, unless specially prohibited by law.".

Section 1650 prohibits females from exercising the elective franchise, or holding civil office.

Section 1651 prohibits minors from the exercise of civil functions, till they are of legal age.

Sections 1652 and 1653 prohibit certain criminals, and persons *non compos mentis*, from exercising certain rights of citizens.

Article 3, chapter 1, title 1, part 2, of the Code defines the rights of the fourth class of natural persons, designated as persons of color : giving them the right to make contracts, sue and be sued, give evidence, inherit, purchase and sell property, and to have material rights, security of personal estate, etc., embracing the usual civil rights of citizens, but does not confer citizenship. Thus the Code stood prior to its adoption by the new Constitution.

As already shown, it was adopted, in subordination to the Constitution, and must yield to the fundamental law, whenever in conflict with it. In so far as the Code had conferred rights on the colored race there is no conflict, and no repeal. The Constitution took away no rights then possessed by them under the Code, but it enlarged their rights as defined in the Code, by conferring upon them the right of citizenship. It transferred them from the fourth class of natural persons, under the above classification, who were denied citizenship by the Code, to the first class, as citizens.

The 46th section of the Code limited citizenship to white persons. The Constitution struck out the word white, and made all persons born or naturalized in the United States, and resident in this State, citizens, without regard to race or color. It so amended section 46 of the Code, as greatly to enlarge the class of citizens. But it repealed no part of section 1648, which defines the rights of citizens.

It did not undertake to define the rights of a citizen. It left that to the Legislature, subject to such guarantees as are contained in the Constitution itself, which the Legislature cannot take away. It declares expressly that no law shall

be made or enforced which shall "abridge the privileges or immunities of citizens of the United States, or of this State." It is not necessary to the decision of this case to inquire, what are the "privileges and immunities" of a citizen which are guaranteed by the Fourteenth Amendment to the Constitution of the United States, and by the Constitution of this State. Whatever they may be, they are protected against all abridgment by legislation. This is the full extent of the constitutional guarantee. All rights of the citizen, not embraced within these terms, if they do not embrace all, are subject to the control of the Legislature.

Whether the "privileges and immunities" of the citizen embrace political rights, including the right to hold office, I need not now inquire. If they do, that right is guaranteed alike by the Constitution of the United States, and the Constitution of Georgia, and is beyond the control of legislation. If not, that right is subject to the control of the Legislature as the popular voice may dictate; and in that case the Legislature would have power to grant or restrict it at pleasure, in case of white persons as well as of persons of color. The Constitution of Georgia has gone as far as the Fourteenth Amendment has gone, and no further. An authoritative construction of the Fourteenth Amendment by the Supreme Court of the United States upon this point would be equally binding as a construction of the Constitution of the State of Georgia, which is in the same words.

Georgia has complied fully with the terms dictated by Congress in the formation of her Constitution. She has stopped nothing short, and gone nothing beyond. The highest judicial tribunal of the Union will no doubt finally settle the meaning of the terms "privileges and immunities" of the citizen, which legislation cannot abridge; and the people of Georgia, as well as those of all the other States, must conform to, and in good faith abide by, and carry out, the decision. All the rights, of all the citizens, of every State, which are included in the phrase "privileges and immunities" are protected against legislative abridgement by the fundamental law of the Union. Those not so embraced,

White *vs.* Clements.

unless included within some other constitutional guaranty are subject to legislative action. The same rights which the Fourteenth Amendment to the Constitution of the United States confers upon, and guarantees to, a colored citizen of Ohio, are conferred upon and guaranteed to every colored citizen of Georgia, by the same amendment, and by the Constitution of this State, made in conformity to the Reconstruction Acts of Congress.

Whatever may or may not be the *privileges* and *immunities* guaranteed to the colored race, by the Constitution of the United States and of this State, it cannot be questioned that both Constitutions make them citizens. And I think it very clear that the Code of Georgia, upon which alone I base this opinion, which is binding upon all her inhabitants while of force, confers upon *all* her citizens the right to hold office, unless they are prohibited by some provision found in the Code itself. I find no such prohibition in the Code affecting the rights of this respondent. I am, therefore, of the opinion that the judgment of the Court below is erroneous, and I concur in the judgment of reversal.

WARNER, J. dissenting.

The defendant in the Court below is a person of color, having, as the record states, one-eighth of negro or African blood in his veins, who claims to be *lawfully* entitled to hold and exercise the duties of the office of Clerk of the Superior Court of Chatham county, and *the* question presented for our consideration and judgment, is, whether a person of color, of the description mentioned in the record, is *legally* entitled to hold office in this State under the Constitution, and the present *existing laws* thereof. The Fourteenth Amendment of the Constitution of the United States, declares that: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The Constitu-

tion of this State, declares that: "All persons born or natu-
ralized in the United States, and resident in this State, are
hereby declared citizens of this State, and no laws shall be
made or enforced, which shall abridge the privileges or im-
munities of citizens of the United States, or of this State."
From the time of the adoption of the Fourteenth Amend-
ment of the Constitution of the United States, and the adop-
tion and ratification of the Constitution of this State, in 1868,
the defendant became (nothwithstanding his color and Afri-
can blood) a citizen of the United States, and of this State,
and is entitled to have all the privileges or immunities of a
citizen.    Does the fact that the defendant was made a *citizen*
of the State, with all the privileges and immunities of a citi-
zen thereof, confer upon him the *legal* right to hold office in
this State as such *citizen ?*   When we take into consideration
the definition, and object of creating an office, and by what
*authority* it is conferred upon a citizen, the distinction be-
tween the privileges and immunities of a *citizen, as such,* and
his right to *hold office,* will be at once apparent, it will be
seen that the privileges and immunities of a citizen, as such,
is one thing, and that his *legal* right to hold office as such
citizen, under the *authority of the State,* is another and quite
a different question.   What is an office?   "An office (says
Bacon) is a right to exercise a public function, or employ-
ment, and to take the fees and emoluments belonging to it.
An officer is one who is *lawfully* invested with an office.   It is
said that the word *officium* principally implies a duty, and in
the next place the charge of such duty, and that it is a rule,
that where one man hath to do with another's affairs against
*his will,* and without *his leave,* that this is an office, and he
who is in it is an officer.   By the ancient common law, offi-
cers ought to be honest men, legal and sage, *et qui melius
sciant et possint officio illi intendere:* and this, says my Lord
Coke, was the policy of prudent antiquity, that officers did
ever give grace to the place, and not the place only, to *grace
the officer:*" 7 Bacon's Ab., 279, title offices and officers.
Blackstone says, the King in England, is the *fountain* of
honor, and of office, and the reason given, is that the law

White *vs.* Clements.

supposes that no one can be so good a judge of an officer's merits and services as the king who employs him. "From the same principle also arises the prerogative of *creating* and *disposing* of offices; for honors and offices are in their nature convertible and synonymous. All offices under the crown, carry, in the eye of the law, an honor along with them, because they imply a superiority of parts and abilities, being supposed to be always filled with those that are most able to execute them:" 1 Bl. Com., 271-2. Offices, (says Blackstone,) are a right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging, and are also *incorporeal heriditaments:* 2 Bl. Com., 36. By the Code, the Governor is required to keep a book of commissions, showing the dates when issued, for *all officers,* civil and military, in *this State:* Code, section 72. The Governor of *the State* is also required to *grant* commissions to all such officers as are required to hold them: Section 63. All citizens of the State, whether white or colored, male or female, minors or adults, idiots or lunatics, are entitled to have all the privileges and immunities of citizens, but it does not follow that all these different classes of citizens are entitled to *hold office* under the public authority of *the State,* because the privileges and immunities of *citizens* are secured to them. The State in this country, as the Crown in England, is the fountain of honor, and of office, and she who desires to employ any class of her citizens in her service, is the best judge of their fitness and qualifications therefor. An officer of *the State,* as we have shown, "hath to do with another's affairs against *his will,* and without *his leave.*" This authority of one citizen to interfere with the affairs of another citizen, against *his will,* and without his *leave,* must be conferred by some public law of the State, from *that class* of her citizens, which in her judgment, will best promote the general welfare of the State. The right to have and enjoy the privileges and immunities of a *citizen* of the State does not confer upon him the *legal* right to serve the State in any *official* capacity, and thus to interfere with the affairs of other citizens of the State, without their leave, and against their will, until that

right is expressly granted to him *by law.* In Dred Scott, vs. Sandford, (19 Howard's Rep., 422) Chief Justice Taney, in delivering the opinion of the Court in that case, said : "Undoubtedly a person may be a *citizen,* that is, a member of the community who form the sovereignty, although he exercises no share of the political power, and is incapacitated from holding *particular offices :* women and minors, who form a part of the political family, cannot vote ; and when a property qualification is required to vote or hold a particular office, those who have not the necessary qualification, cannot vote or hold office, yet *they are citizens.*" Mr. Justice Curtis, in his dissenting opinion in that same case, page 583, said : "So in all the States, numerous persons, though *citizens,* cannot vote, or *cannot hold office,* either on account of their age, or sex, or the want of the necessary legal qualifications. The truth is, that *citizenship* under the Constitution of the United States, is not dependent on the possession of any particular *political,* or *even of all civil rights,* and any attempt so to define it, must lead to error. To *what citizens* the elective franchise shall be confided, is a question to be determined by *each State,* in accordance with its own views of the necessities or expediencies of its condition. What *civil rights* shall be enjoyed by *its citizens,* and whether *all* shall enjoy the same, or how they may be gained, or both, are to be determined in the *same way,* But whether native born women, or persons under age, or under guardianship, because insane or spendthrifts, be exluded from voting, or *holding office,* or allowed to do so, I apprehend no one will deny that they are *citizens* of the United States." See Corfield vs. Coryell, 4 Washington's C. C. Rep., 381, to the same point. The defendant, therefore, cannot *legally* claim any right to hold office, either under the Fourteenth Amendment of the Constitution of the United States, or the Constitution of this State, which make him a *citizen* and guarantee unto him, the privileges and immunities of a *citizen,* for he may well have and enjoy all the privileges and immunities of a *citizen* in the State, without the legal right to hold *any office,* or to exercise any public or official duty under *the authority of the State.* The privileges

and immunities of a citizen of the State, as secured by the Constitution, do not confer the *legal right* to hold office under the *public authority of the State,* and receive the emoluments thereof.

Does the public law of the State, recognized and adopted by the Constitution of 1868 (known as Irwin's Code), confer upon the defendant the *legal* right to hold office in *this State?* The Code took effect as the public law of the State, on the first day of January, 1863. By the 46th section thereof, it is declared, "all *white* persons born in this State, or in any other State of this Union, who are or may become residents of this State, with the intention of remaining herein; all *white* persons naturalized under the laws of the United States, and who are or may become residents of this State, with the intention of remaining herein; all persons who have obtained a right to citizenship under *former laws;* and all children, wherever born, whose father was a citizen of this State at the time of the birth of such children, or in case of posthumous children, at the time of his death, are held and deemed *citizens* of this State. Persons having one-eighth or more of negro or African blood in their veins, are not white persons in the meaning of this Code." The 1646th section declares, that "natural persons are distinguished according to their rights and *status,* into 1st. citizens, 2d. residents not citizens, 3d. aliens, 4th. *persons of color.* The persons to whom belong the rights of *citizenship,* and the mode of acquiring and losing the same, have been specified in a former article (referring to article 46, before cited). Among the rights of *citizens* are, the enjoyment of personal security, of personal liberty, private property and the disposition thereof, the elective franchise, the right to *hold office,* to appeal to the Courts, to testify as a witness, to perform any civil functions, and to *keep and bear arms:*" Sections 1647, 1648, 1649, 1650, 1651, 1652, 1653, of the Code.

It will be remembered, that at the time of the adoption of the Code in 1863, the defendant was *not a citizen* of this State, and was not recognized by the Code as a *citizen thereof.* By the 1646th section, the *status* of the defendant is defined

to be that of a *person of color*, and *not that of a citizen.*   The Revised Code adopted by the Constitution of 1868, includes the Act of 1866, which declares that, " all negroes, mulattoes, mustizoes, and their descendants, having one-eighth of negro or African blood in their veins, shall be known in this State as *persons of color*, and *specially* defines their legal rights; but the right *to hold office* is not one of them: Revised Code, section 1661.

It is true, that *since* the Code was adopted as the public law of the State, the defendant has been made a *citizen;* but all the legal rights conferred upon citizens by the Code were conferred upon *that class of persons only*, who were declared and recognized by the Code as *citizens of the State*, at the time of its adoption.   When the Code declares, that it shall be the right of a *citizen* to hold office, such right is confined to that class of persons who were recognized and declared therein to be *citizens of the State at that time*, and not to any other class of persons who might *thereafter* become citizens.   So, when the Code declares, that " all *citizens* are entitled to exercise all their rights as such, unless prohibited by law," it is applicable to that class of persons only who were declared to be *citizens* of the State at *that time*, and not to any other class of persons who might *thereafter* be made citizens of the State, such as Chinese, Africans, or persons of color.   The truth is, that *the public will of the State* has never been expressed by any legislative enactment in favor of the right of her colored citizens to hold office in this State, *since they became citizens thereof.*   Although, these several classes of persons might be made citizens of the State, with the privileges and immunities of citizens, still they could not *legally* hold office under the authority of the State, until that right shall be conferred upon them by some public law of the State, *subsequent* to the time at which they were made citizens, so as to embrace *them* within its provisions. The public will of the State, as to the legal right of *that class* of her citizens to hold office, has never been affirmatively expressed; but, on the contrary, when the proposition was distinctly made in the Convention which formed the

present Constitution, to confer the right upon colored citizens to *hold office* in this State, it was voted down by a large majority. See Journal of Convention, page 312. So far as there has been any expression of the public will of the State, as to the legal right of *that class of citizens* known as colored citizens, *since* they became such, to hold office in this State, it is *against* that right now claimed by the defendant. The insurmountable obstacle in the way of the defendant's *legal* right to hold office in this State, under the provisions of the Code, is the fact, that he was *not a citizen* of the State at the time of its adoption. The class of persons to which he belongs, were not recognized by it as *citizens*, and therefore he is not included in any of its provisions which confer the right to hold office upon *the* class of citizens specified in the Code.

Persons of color were not in the contemplation or purview of the law-makers when they declared and defined the *rights of citizens* in the Code with respect to *holding office*, and to *keep and bear arms*, as therein expressed. The Code makes no provision whatever for *colored citizens* to hold office in this State; all its provisions apply exclusively to *white* citizens, and to no other class of citizens. The Convention which framed the State Constitution, and declared persons of color to be citizens, *could* have conferred the right upon them to hold office, but declined to do so by a very decided vote of that body, and went before the people, claiming its ratification upon the ground that colored citizens were *not entitled to hold office* under it, and there can be no doubt that the people of the State voted for its ratification at the ballot-box with *that understanding*. But *now* it is contended that the defendant, though a person of color, whose *status* was fixed by the Code, has been made a *citizen* of the State and of the United States, and that no enabling act has ever been passed, to allow a naturalized citizen to hold office in this State where he possessed the other requisite qualifications prescribed by law; that the defendant having been made a citizen of the State, is entitled to hold office in the same manner as a naturalized citizen could do. The reply is, that naturalized

citizens were *white* persons, and as such had a common law right to hold office in this State, a right founded upon immemorial usage and custom, which has existed so long that the memory of man runneth not to the contrary: 1st Bl. Com., 76. This principle of the common law is recognized and adopted by the Code as being of force in this State. Until the adoption of the Code in 1863, there was no *statute law* declaring that it should be one of the rights of a *white* citizen to *hold office* in this State. The Code, when it declares that one of the rights of *that class of citizens specified therein,* shall be the right to *hold office,* did nothing more than *affirm* a common law right which the native-born and naturalized *white* citizen had always enjoyed in this State by immemorial usage and custom. The *legal* right of the *white* citizen to hold office in this State was just as perfect and complete under the rule of the common law before stated, *anterior* to the adoption of the Code in 1863, as it is now *since* the adoption of the Code. The Court simply *affirmed* the common law, as the same had always existed in this State, in relation to the right of a *white* citizen to hold office. No such common law right, however, can be claimed in this State, in behalf of persons of color, to *hold office.* They had but *recently* been made citizens of the State, and have not heretofore enjoyed the right, either to vote, or to hold office. They can claim nothing by *usage* and *custom,* under the rule of the common law, either as it regards their right to *vote,* or to *hold office.* Before they can claim the legal right to vote, or to hold office in this State, they must show the *positive* enactment conferring that right, either in the Constitution of the State, or in some statute of the State, passed *since* they became citizens thereof. In 1848, in the case of *Cooper and Worsham vs. the Mayor and Aldermen of the City of Savannah,* (4 *Ga. Rep.,* 72,) it was unanimously held, and decided by this Court, that free persons of color, were not entitled to *vote,* or to hold *any civil office in this State.* Thus stood *the law* in this State, up to the time persons of color were made citizens thereof. The native-born or naturalized *white* citizen can claim his common law right to hold office in this

White *vs.* Clements.

State. The colored citizen cannot claim any such common law right, for the reason that he has never exercised and enjoyed it heretofore, and that constitutes the difference between the *legal* right of a naturalized *white* citizen to hold office in this State, and a person of color, who has *recently* been made a citizen, *since* the adoption of the Code, and who is not embraced within its provisions. The one can claim a common law right to hold office in the State, by *immemorial usage and custom*, the other cannot, and until the State shall declare, by some legislative enactment, that it is her will and desire, that her colored citizens shall hold office under *her authority*, they cannot claim the *legal* right to do so ; for we must not forget that the State is the *fountain* and *parent* of office, and may confer or refuse to confer the right to hold office, upon *any class of her citizens* she may think proper and expedient. When a *new class* of persons are introduced into the body politic of the State, and made citizens thereof, who cannot claim a common law right to hold office therein, by immemorial usage and custom, it is encumbent on them to show, *affirmatively*, that such right has been conferred upon them by some public law of the State, *since* they were made citizens thereof, to entitle *them* to have and enjoy such right. In other words, they must show the public law of the State, enacted *since* they became citizens thereof, which confers the *legal right claimed*, before they can demand the judgment of the Court in favor of such legal right.

All male white citizens of the State, whether native-born or naturalized citizens (having the necessary legal qualifications), have a common law right, by immemorial usage and custom, to hold office therein, under her authority ; and in order to deprive them of that common law right, a *prohibitory* statute is necessary. A naturalized citizen could claim this common law right to hold the office of President of the United States ; hence the prohibition in the Constitution thereof. But as colored citizens of the State, who have recently been made such, cannot claim any common law right to hold office therein under her authority, no *prohibitory* statute is necessary to deprive them of a right which they never

had, either under the common or statute laws of the State. When, therefore, it is said, that colored citizens have the legal right to hold office in the State, unless *specially prohibited by law*, it must be shown *affirmatively*, that they had previously enjoyed that right. If they cannot show their right to hold office in the State, either under the provisions of the Constitution, the statutes thereof, or by the common law, the fact that they are not *specially prohibited* from exercising a right which they never had, amounts to nothing, so far as *investing* them with the legal right to hold office is concerned.

When, and where, and by what *public law of the State*, was the legal right to hold office therein, conferred on the colored tcitizens thereof? If this question cannot be answered, if the legal authority under which the right is claimed cannot be shown, then the argumen, that, inasmuch as there is no *special prohibition* in the laws of the State against the right of colored citizens to hold office, they may hold office, falls to the ground. If there was *no existing legal right* to hold office to be *prohibited*, the fact that there is no prohibition does not confer such legal right. There was no *legal* necessity to prohibit that which *did not exist*. It is not the business or duty of Courts to *make* the laws, but simply to expound and enforce *existing laws* which have been prescribed by the supreme power of the State.

But it is insisted in this case, that inasmuch as the Constitution of 1868 made persons of color citizens, and adopted the Code which defined the rights of citizens in 1863, as citizenship *then* existed in this State, *therefore*, colored citizens are entitled to hold office under the provisions of the Code, which was enacted by the Legislature five years before colored persons were made citizens by the Constitution. It is true, that the Constitution enlarged the class of citizens in the State, by the introduction of a *new class* of citizens, which were not known as such, to the law-makers in 1863, and were not contemplated by them when they defined the *rights of citizens* at that time. The Constitution expressly confers the right to *vote* upon this new class of citizens, but does not

confer the right to *hold office* ; but on the contrary, the Convention *pointedly refused* to confer *that right.* With what legal propriety, then, can it be said that the framers of the Constitution *intended* to confer upon colored citizens the right to *hold office* by adopting the Code, which fixed their *status* as persons of color, when they expressly refused to do so in the Constitution ; they cannot legally be presumed to have intended to do that *indirectly* which they positively declined to do *directly.* It may be conceded that the Constitution made persons of color *citizens* of the State, but it does not, by any means, follow that the Code which had been enacted by the Legislature, five years before, defined and regulated *their legal rights as such citizens.* That section of the Code which defines the rights of *white* citizens (the only class of citizens recognized by it) is not repugnant to the Constitution of 1868, the only legal difficulty in the way, is that it does not include *colored citizens;* they were not in the contemplation of the law-makers at that time, for the simple reason that they were not made citizens of the State until *five years afterwards.* It is a cardinal rule in the construction of statutes, that the words thereof are always to be understood in regard to the *subject matter;* for that is always supposed to be in the eye of the legislator, and all his expressions directed to that end : 1 Bl. Com., 60. What *class* of citizens were the legislators providing for in 1863 ? What *class* of citizens did the legislators of 1863 declare should hold office in this State ? What *class* of citizens constituted the *subject matter* of citizenship about which they were legislating at *that time?* Does any sane man believe that the legislators of this State, in 1863, when they declared in the Code, "that among the rights of citizens, are the right to *hold office,* and to *keep and bear arms,"* intended to confer these rights upon *that class* of persons who now claim them under the Code, as colored citizens ? The Constitution of 1868 adopted the Code as a body of laws enacted by the Legislature of the State, just as they stood upon ·that statute book, when not inconsistent with that Constitution. As before suggested, that portion of the Code, which defined and declared the rights of *white* citizens to hold of-

fice in this State, is not repugnant to, nor inconsistent with the Constitution of 1868, but the legal obstacle in the way is, that the Code makes no provision for colored citizens to *hold office,* confers no such right upon *them,* unless, indeed, it can be maintained as a sound legal proposition, that an Act passed five years before they became citizens of the State, defining and declaring the rights of *white* citizens, necessarily includes *colored citizens,* who have been made such *since* the passage of that Act. If the Code, when it was adopted by the Legislature, in 1863, did not confer the right to *hold office* upon persons of color, now declared citizens, then, it does not do so now, for it was adopted by the Constitution of 1868 as it then stood, so far as this question is concerned, and all attempts to *inject* into the Code any words, or provisions, not contained therein at the time of its adoption by the Legislature, is an *assumption* wholly unauthorized by law. After persons of color were made citizens of the United States, by the Fourteenth Amendment of the Constitution of the United States, Congress thought it necessary to pass two *special* Acts, to confer upon them the right *to vote,* and *to hold office,* in the District of Columbia. See Acts of Congress of 1866 and 1868. They were *citizens* of the United States, but they could not claim a common law right, by immemorial usage and custom, either to *vote* or to *hold office* as such citizens in the District of Columbia, hence the *legal* necessity for Congress to pass the two Acts referred to, *specially* conferring upon *that class of citizens* the right to *vote* and to *hold office.*

By the laws of this State, as declared by the unanimous judgment of this Court, in the case of *Cooper & Worsham vs. the Mayor and Aldermen of the City of Savannah,* free persons of color were not entitled to vote, or to hold any civil office in this State; and thus the law stood at the time of the adoption of the Code in 1863 by the Legislature. The Constitution of 1868 made them citizens, and conferred upon them the right to *vote ;* but the Convention that framed that Constitution *expressly refused* to confer upon them the right to *hold office,* as the Journal of that Convention most clearly shows. The Code does not confer upon the colored citizens

of this State the right to *hold office,* for the reason that it was adopted by the Legislature five years *before* they became *citizens,* and they were not contemplated or embraced within any of the provisions thereof, which declared and defined the rights of *that class* of citizens specified therein.   They cannot claim a common law right, by immemorial usage and custom, to hold office in this State; and until such right shall be conferred upon them, by some *public law of the State,* they cannot claim any *legal* right to its enjoyment, under the *present existing laws* thereof.

After the most careful examination of this question, I am clearly of the opinion, that there is *no existing law of this State* which confers the right upon the colored citizens thereof to hold office, and consequently, that the defendant has no *legal* right to hold and exercise the duties of the office which he claims under *her authority;* and that the judgment of the Court below, overruling the demurrer, should be affirmed.